The **ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY**, a corporation, Plaintiff,

v.

**JOHN SEXTON & COMPANY**, a Division of Beatrice Foods Company, a corporation, Defendant.

Civ. A. No. T–4922.

United States District Court,
D. Kansas.

Feb. 17, 1972.

---

J. B. Reeves, Topeka, Kan., for plaintiff.

Joseph McDowell, Robert S. Lemon, Kansas City, Kan., for defendant.

## MEMORANDUM OF DECISION

TEMPLAR, District Judge.

This is another dispute between a shipper and a carrier over the applicable rate to be charged for goods shipped. As often happens, this case did not arise from a dispute between the parties but when the Western Weighing & Inspection Bureau informed the carrier that the shipper had not complied with the tariffs, and, therefore, was not eligible for the lower "through" or "in-transit" rate but must pay the "flat" rate and that the carrier had therefore undercharged the shipper. This case arises under 49 U.S.C. § 1 et seq., and jurisdiction vests in this Court pursuant to 28 U.S.C. § 1337.

All the facts have been stipulated to, and both parties agree the only issues remaining are ones of law. The case is before the Court at this time on both parties' motions for summary judgment.

The purpose of this lawsuit is to determine the proper "freight rate" applicable to 58 carload shipments made by the defendant over plaintiff's railroad from Kansas City, Kansas, to various places in the nation.

The plaintiff seeks to apply what is known as a "flat" rate, and defendant seeks to apply what is known as a "balance" or "through" rate.

Defendant is engaged in the food business and has storage facilities in Kansas City, Kansas. It obtains commodities in many instances in carload lots from various points of origin, ships them to its storage area in Kansas City, Kansas, unloads and stores them for periods of time, then reships the commodities from Kansas City, Kansas, to various points of final destination.

Applicable tariffs contain provisions for what is known as a "through" rate —for example, a rate from the west coast to the east coast. Such a "through" rate is lower than the combination of the rates from the west coast to Kansas City plus the rate from Kansas City to the east coast, such combinations of rates being known as "flat" rates.

For firms engaged in business with shipping needs such as the defendant, the applicable tariffs provide for what is known as "transit" or "in-transit" shipments. These tariffs permit defendant to obtain the benefits of the lower "through" rate with the privilege of placing the commodities in storage-in-transit. This means the first haul ends when the commodities get to Kansas City, Kansas, where they go into storage, then later a second haul occurs when they are removed from storage and reshipped to final destination.

The inbound shipment is pursuant to a Uniform Bill of Lading (49 U.S.C. § 81 et seq.) prepared at the point of origin, naming the point of origin, describing the freight car, the route to be taken, weight and description of the commodities comprising the shipment, and the consignee (in this instance the defendant in Kansas City, Kansas).

The second copy of the Uniform Bill of Lading, sometimes referred to as the shipping order, is used by the railroad as its shipping instructions to move the car. The railroad then prepares a freight bill setting out the charge based on a rate that has been published and on file with regulatory agencies. In due time, the freight bill reaches either the shipper or consignee who then pays the freight charge from point of origin to the transit point (in this instance, Kansas City, Kansas).

The defendant has a storage-in-transit arrangement for its storage facilities in Kansas City, Kansas, supervised by the Western Weighing & Inspection Bureau

as tariff agent for the railroads serving Kansas City, Kansas. This permits the defendant to declare certain shipments to be for storage-in-transit and apply the long haul "through" rate.

Using the storage-in-transit practice requires careful records in order to be sure that the "through" rate was only applied to shipments that were entitled to "transit" treatment. (If a shipment came into the defendant's facilities by truck, for example, and was later reshipped by rail to final destination, it was not eligible for "transit" treatment and the proper charge was a "local" rate for the rail shipment based on the distance moved.) The "through" rate results in lower charges than the combination of two "flat" rates.

The Western Weighing & Inspection Bureau acts as tariff agent for all railroads in Kansas City, Kansas, to audit records of shippers availing themselves of the "transit" practice to determine if the proper tonnage and tariff application has been made.

During the months of July, August, and September, 1969, the defendant reshipped from Kansas City, Kansas, some 58 carloads of groceries to various destinations in eastern and southern states. Each car contained commodities that had been stored in the defendant's warehouse in Kansas City, Kansas, under a storage-in-transit arrangement.

The applicable tariffs governing this transit privilege provided:

| Item | PART | SUBJECT | RULES AND REGULATIONS |
|---|---|---|---|
| | | | (A) At the time commodities are reshipped from transit houses, shippers will be required to present to carrier's representative the inbound carrier's representative's recorded original freight bills with bills of lading and shipper's certificate in duplicate. The shipper's certificate, carrying full information as to the billing tendered against the outbound shipment, shall be in the following form: |

SHIPPER'S CERTIFICATE

This is to certify that the billing listed under inbound is applicable to the commodity forwarded, as provided in the Governing Tariff.

_____
(Signature of Shipper)

| Item | SUBJECT | TRANSIT RECORD NO. | ORIGIN POINT | DATE | BILLED FROM | ROAD | INITIAL NO. | COMMODITY | WEIGHT APPLIED | INBOUND RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 115 | SHIPPER'S CERTIFICATE AND SHIPPING DIRECTIONS | | | | | | | | | |

The agent of the Railway Company did not require, and the agent of the defendant did not furnish, at the time of reshipment, the shipper's certificate or other documents specified in the tariff. However, such documents were furnished by the defendant to the agent of the Railway Company at a later date.

The Railway Company billed the defendant and the defendant paid freight bills based upon the lower "through" or "in-transit" rate.

Some six to seven months after shipment, the Western Weighing & Inspection Bureau at Kansas City issued corrections on these shipments on the grounds that since the defendant had not furnished the shipper's certificate and other documents at the time of reshipment, as was required by the tariff, the defendant was not entitled to the lower "through" or "in-transit" rate, but that the shipments should be billed at the "flat" rate, thus giving rise to an

undercharge on the shipments in the total amount of $16,900.63.

The tariff provision in effect at the time of shipment had been in effect at least since February 16, 1953. Some nine months after these shipments moved, the Interstate Commerce Commission, upon application by the plaintiff railroad and others, amended this tariff provision effective June 7, 1970, to give a transit shipper a 7-day period, followed by a 5-day period with penalty, after the commodities are reshipped, within which to surrender to the railroad agent the transit billing documents.

The issue, as stipulated between the parties, is stated to be:

"Under the facts stipulated is defendant indebted to the plaintiff in the sum of $16,900.63 on the grounds that defendant has failed to comply with Tariff W–213–B, Item 2470, Part 115 . . . or was the in-transit 'through' rate applicable to the reshipments?"

■ It is well settled that tariffs, duly filed, bind both carrier and shipper with the force of law. Lowden v. Simonds, etc., Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953 (1939); Union Pacific Railroad Co. v. Corneli Seed Company, 161 F.Supp. 52 (D. Idaho 1958). This is so because the Interstate Commerce Act, which requires the tariffs to be filed, "is affected throughout its provisions, with the object not merely of regulating the relations of carrier and shipper inter se, but of securing the general public interest in adequate, non-discriminatory transportation at reasonable rates." Midstate Horticultural Co. v. Penna. R. Co., 320 U.S. 356, 361, 64 S.Ct. 128, 130, 88 L.Ed. 96 (1943).

■ Since public policy is involved here, it makes no difference that the carrier acquiesced in the practice of the shipper and did not demand strict performance of all provisions of the applicable tariff. Public Policy demands strict performance of the tariff, and any variation less than strict performance constitutes a preference. See Utah Poultry Producers Co-op v. Union Pacific R. Co., 147 F.2d 975 (10th Cir. 1945); and Union Petroleum Corporation v. United States, 376 F.2d 569 (10th Cir. 1967). "[I]n respect to many matters concerning which variation in accordance with the exigencies of particular circumstances might be permissible, if only the parties' private interests or equities were involved, rigid adherence to the statutory scheme and standards is required. This 'obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.' Louisville & Nashville R. R. v. Maxwell, 237 U.S. 94, 97 [35 S.Ct. 494, 495, 59 L.Ed. 853, L.R.A.1915E, 665]." Midstate Horticultural Co. v. Penna. R. Co., supra.

■ The facts show that the shipper did not comply with the tariff in that he did not "present to the carrier's representative the inbound carrier representative's recorded original freight bills with bills of lading and shipper's certificate," *at the time the commodities were reshipped*, but furnished such papers a few days later. (Emphasis supplied.) Thus the shipper violated the tariff as a matter of law and does not qualify for the transit privilege. He must, therefore, pay the flat rate.

Defendant argues strenuously that he should not have to pay the "flat" rate, but is entitled to the "through" rate, on several grounds. The facts show that due to automation, i.e., much of defendant's record keeping is done by computer, it is not possible to have the required records at the time of reshipment, but that it takes a few days to produce them. The facts also show that a practice had developed, and that the plaintiff had acquiesced in it, wherein the shipper would provide the carrier with a "memorandum billing" which had a minimum amount of information on it, i.e., enough to enable the carrier to deliver the shipment to the desired destination, and the "transit billing" would be provided at a later date when the computer had produced it.

■ The defendant argues that because of the above facts, the provision which required the "transit billing" to be presented to the agent of the carrier "at the time the commodities are reshipped," is unjust and unreasonable within the meaning of 49 U.S.C. § 1(6) and should therefore be declared unlawful. This Court does not find this provision to be unjust or unreasonable. When the said provision was inserted or became a part of 115, it was not unreasonable in that to insure proper "transit billing", extensive records must be kept and certain records matched against each other. Due to defendant's modernization in record keeping, supplying the "transit billing" at the time the commodities are reshipped became impracticable for them, but that does not make the tariff unjust or unreasonable such as to be unlawful. Now the tariff has been changed to accommodate defendant and other shippers in a similar position. The Court might add at this time that the fact the tariff has been changed does not make the previous tariff unreasonable.

■ The defendant argues that nowhere in the tariff does it state that there is a penalty or that the "flat" rate applies if all the provisions are not complied with. However, the "flat" rate always applies unless one qualifies for the "through" rate. The "through" rate is a privilege and in order to receive this special concession all provisions granting such privilege must be complied with. See Utah Poultry Producers Co-op v. Union Pacific R. Co., supra; and Chicago & N. W. R. Co. v. Connor Lumber & Land Co., 212 F.2d 712, 714 (7th Cir. 1954).

■ The fact that plaintiff had knowledge of defendant's "memorandum billing" practice and acquiesced is of no consequence. The carrier cannot waive a provision of a tariff and estoppel cannot be applied against them; again this is because of the public interest. Chicago & N. W. R. Co. v. Connor Lumber & Land Co., supra; and Union Pacific Railroad Company v. Corneli Seed Company, supra.

■ This Court finds as a matter of law that the fact that the plaintiff filed a tariff permitting the grain trade to have 7-days to get their "transit billing" to the carrier back in 1965 is not a preference in violation of the Elkins Act, 49 U.S.C. §§ 41, 43 and does not violate 49 U.S.C. § 5(1). In the first place the grain trade is operating under a different tariff.

"Rate and tariff items are promulgated for laymen to use in their ordinary affairs and where the language is plain they should be given their plain meaning." Associated Wholesale Grocers, Inc. v. United States, 272 F.Supp. 274 (D.Kan.1967). Applying this to the tariff provision in question, the plain meaning is not at all ambiguous. "Any claimed ambiguity or doubt in meaning as to such a provision (i.e., tariff provision) must . . . have a substantial and not a mere arguable basis." Christensen v. Northern Pac. Ry. Co., 184 F.2d 534 (8th Cir. 1950).

So, though the equities of this dispute are undoubtedly with defendant, a tariff involves the public interest which is paramount. The public interest demands that tariffs be strictly construed. Therefore, pursuant to the foregoing discussion, plaintiff's motion for summary judgment is sustained; defendant's motion for summary judgment is overruled.

It is so ordered.