## LOWDEN ET AL., TRUSTEES, *v.* SIMONDS-SHIELDS-LONSDALE GRAIN CO.

No. 342. Argued January 30, 31, 1939.—Decided March 27, 1939.

---

[8] *Patterson* v. *Alabama,* 294 U. S. 600, 607.

Messrs. *Hale Houts* and *Dean Wood,* with whom *Messrs. Charles M. Miller, Cyrus Crane,* and *William S. Hogsett* were on the brief, for petitioners.

*Mr. Melvin W. Borders, Jr.,* with whom *Mr. Dupuy G. Warrick* was on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This case is here on certiorari to review the judgment of the Circuit Court of Appeals for the Eighth Circuit affirming a judgment of the district court for the respondent. Certiorari was granted for consideration of a federal question of substance, to wit, whether a carrier's charges for services, actually utilized by a shipper and authorized by a tariff requiring prior arrangements for the services, are uncollectible when the services are rendered on orders, preceded or accompanied by denials of legal liability. Substantial conflict was alleged.[1]

The facts were stipulated. The petitioners, as trustees of the Chicago, Rock Island and Pacific Railway Company, brought suit, under § 24 (8) of the Judicial Code,[2] in the United States District Court for the Western District of Missouri, for the value of services rendered in the installation of grain doors on box cars used by the respondent to ship grain in bulk in interstate commerce.

---

[1] Cf. *Wabash Ry. Co.* v. *Horn,* 40 F. 2d 905, 906 (C. C. A. 7).

[2] 28 U. S. C. § 41. "The district courts shall have original jurisdiction as follows: . . . Eighth. Of all suits and proceedings arising under any law regulating commerce." See *Louisville & Nashville R. Co.* v. *Rice,* 247 U. S. 201, 203.

Grain doors are required to prevent leakage of grain from the car while in transit. They are wooden barriers which must be placed inside the box car doors before loading and removed upon unloading. Before July 1, 1935, they were furnished and installed by carriers without separate charge. Effective that day, a tariff filed with the Interstate Commerce Commission continued the carriers' practice of furnishing the materials for grain doors but shifted the cost of installation to the shippers. It provided as follows: "The railroad will act as shipper's agent and install grain doors . . . at a charge of one dollar ($1.00) per car; prior arrangements for the service to be made with the carriers and to cover a specified period of time . . ."

On July 2, 1935, the day after the tariff went into effect, the respondent, together with other shippers, addressed a letter to the local freight agents of several carriers, including the Chicago, Rock Island and Pacific, in which they announced that despite the tariff they expected the railroads, from and after July 1, 1935, to furnish cars with equipment to carry bulk grain safely, and would decline to pay for the service of installing grain doors in the cars. They wrote in part: "Said undersigned parties further notify you that if ordinary box cars are furnished and supplied upon such orders [for cars for the shipment of bulk grain] they will expect them to be fully coopered or prepared with necessary side-door, barricades completely installed and ready for loading."

The carriers protested that neither they nor the shippers could be parties to practices not in conformity with the tariff. They declared that unless the shippers made unqualified arrangements pursuant to the terms of the tariff, cars would be furnished without the grain doors installed. This letter, dated July 15, 1935, evoked no reply. Between July 1, 1935, and February 29, 1936, the petitioners upon the orders of respondent supplied the

Grain Company with 624 box cars for the shipment of grain in bulk. Before the cars were loaded, the petitioners installed the necessary grain doors. Bills, rendered monthly, charged the respondent $1.00 for each car. On November 22, 1935, the latter returned the bills, declining to pay on the ground that it had made no arrangement for the petitioners to install grain doors as its agents, as contemplated by the tariff. It concluded with a request that petitioners reveal the justification for the charges in the absence of any arrangement. The petitioners' agent replied on January 9, 1936, that the letter of July 2, 1935, had been construed to effect an arrangement and "accepting such prior arrangement, the cars were coopered for your account and as your agent, and were accepted and used by you as such." By letter of January 15, 1936, the respondent disagreed with petitioners' construction of the letter of July 2, 1935, and reiterated its intention not to pay.

On April 4, 1936, the petitioners began this suit, asking judgment for $624. Before trial in the district court, the Interstate Commerce Commission passed upon the validity and reasonableness of the charge for this particular service. On April 12, 1937, the Commission ruled that it was proper to require the shipper to bear the expense of installing grain doors furnished by the carrier; that the clause relative to prior arrangements was not ambiguous; that it was for the carrier's benefit and could be waived; that the charge of $1.00 per car was unreasonable and should be limited to $.60 per car. It ruled further that shippers who had paid the $1.00 charge were entitled to reparation and that carriers might waive collection above the sixty-cent charge from shippers who had not yet paid. 220 I. C. C. 753.[3] The petitioners reduced their demand

---

[3] Three commissioners dissented. The decision of the Commission is part of the record. *A. J. Phillips Co.* v. *Grand Trunk W. Ry. Co.,* 236 U. S. 662, 664; cf. *Robinson* v. *Baltimore & Ohio R. Co.,* 222 U. S. 506, 511–12.

in the district court to $.60 per car and asked judgment for $374.40.

The district court gave judgment for the respondent. 19 F. Supp. 438. The circuit court of appeals affirmed, one judge dissenting. 97 F. 2d 816.

The ruling of the Interstate Commerce Commission determines that the installation is a duty of the shipper and that the carrier can only receive sixty cents when it acts for the shipper in performing that duty. These are the essential provisions of the tariff. To facilitate the rendition of the service prior arrangements are required. The dominant -elements are the responsibility for and the amount of the charge. These are fixed by the tariff. The letter of July 2, 1935, from the shippers required the installation of the grain doors and the respective orders for the separate cars, given thereafter, were given in the light of this demand for cars so equipped. We think this was an arrangement under the tariff. On July 2, 1935, the respondent clearly signified its desire for cars fully coopered and ready for loading. Its letter of that date was an unconditional request for the petitioners' services for a sufficiently specified period of time—"from and after July 1, 1935." The announcement that respondent would decline to pay for them in no way qualified the request for tariff services, and cannot now stave off liability. The petitioners could disregard this advance disclaimer of liability and rely upon the courts to enforce observance of the tariff. Until changed, tariffs bind both carriers and shippers with the force of law.[4] Under § 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service in connection with the transportation of property.[5] That section for-

---

[4] *Robinson* v. *Baltimore & Ohio R. Co.*, 222 U. S. 506, 509; *Pennsylvania R. Co.* v. *International Coal Co.*, 230 U. S. 184, 197.

[5] Act of Feb. 4, 1887, 24 Stat. 379, 381, as amended, 49 U. S. C. § 6 (7).

bids the carrier from giving a voluntary rebate in any shape or form. This Court has had occasion recently to sustain action of the Commission aimed at carriers' practices resulting in collection of less than the tariff rate.[6] It is equally important to aid the efforts of a carrier in collecting published charges in full.[7] Involuntary rebates from tariff rates should be viewed with the same disapproval as voluntary rebates.

The respondent suggests that the suit must fail because based upon a tariff held by the Interstate Commerce Commission "unreasonable and unlawful." The Commission did not hold the tariff unlawful or wholly unreasonable. It clearly recognized the validity of a tariff charge for installation services rendered by carriers at the request of shippers, but found $1.00 per car unreasonable to the extent that it exceeded $.60. It awarded reparation to those who had paid $1.00 per car and authorized the carriers to waive collection of the amount over $.60 per car from shippers who had not paid.[8] The only relief afforded respondent by the Commission's decision is a right to reparation for all payments over $.60 per car.[9] The voluntary reduction of their claim by the petitioners is a sensible adjustment of their right to recover the tariff charge and of their obligation to make reparation to the extent that it is unreasonable.

It is unnecessary to consider various other contentions made by both the petitioners and the respondent.

*Judgment reversed.*

---

[6] *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507.

[7] Cf. *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Fink,* 250 U. S. 577; *New York Central & Harlem River R. Co.* v. *York & Whitney Co.,* 256 U. S. 406.

[8] Chicago Board of Trade *v.* Abilene & S. Ry. Co., 220 I. C. C. 753, 769.

[9] Cf. *A. J. Phillips Co.* v. *Grand Trunk W. Ry.,* 236 U. S. 662, 665; *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.,* 284 U. S. 370, 384.